**Mona L. CARUSO and John Caruso, Sr., Appellants,**

**v.**

**Dr. Jack H. BROWN, Jr., D.P.M., and Mid-Del Podiatry, Inc., an Oklahoma corporation, Appellees.**

**No. 58671.**

Court of Appeals of Oklahoma, Division No. 4.

July 17, 1984.

Released for Publication by Order of Court of Appeals Aug. 10, 1984.

---

Larry R. Monard, Berry & Berry, P.C., Oklahoma City, for appellants.

Stephen Peterson, Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, for appellees.

BRIGHTMIRE, Judge.

For review in this medical malpractice action is the trial court's decision to grant defendants a summary judgment after apparently concluding the deposition of plaintiff established that the two-year statute of limitations p. escribed in 76 O.S.1981 § 18 had run on plaintiffs' causes of action.

We hold the trial court misconstrued the statute and reverse the summary judgment.

## I

Defendant Jack H. Brown, Jr., D.P.M., is a podiatrist working for defendant Mid-Del Podiatry, Inc. He saw plaintiff Mona Caruso [1] August 17, 1978, and received a history that she had slipped, twisted her right ankle and fallen on her foot in a bowling alley mishap some two years before. Her chief complaint was that the injured foot was giving her a lot of pain—a problem exacerbated by having to be on her feet for long periods of time while working in her husband's bakery.

Defendant examined plaintiff's right foot and leg and found no neurological deficits or reflex abnormalities. He did find a bunion on each foot—a large one on the right—but the "thing that was the most significant," he said, "was the pain in the back part of her [right] foot."

Surgery, Brown told plaintiff, "would be the best approach," and scheduled it for August 29. The reason for this conclusion was that defendant thought he saw some narrowing of a midtarsal joint, actually two

---

**1.** For convenience, we shall refer to Mona Caruso as plaintiff even though her husband, John Caruso, is also a plaintiff.

joints—the talonavicular and calcaneocuboid joints.

"The procedure that I chose, due to the amount of pain that Mona had at the time," said the podiatrist, "was to do a fusion of both joints in the midtarsal joint.... I wasn't sure if there was some problem with her subtalar joint as well, which is the joint in back of the midtarsal joint.... [A] commonly-done procedure for severe arthritis is to do an arthrodesis of the midtarsal and subtalar joint, together. All three joints."

Even though evidence of arthritis was questionable, Brown decided to do a double arthrodesis, that is, fuse two of the three joints he referred to.

Why did he decide to fuse only two joints?

"I wasn't really sure," the surgeon said.

During the examination of plaintiff's foot he determined that "she had a gastrocnemius equinus"—that is, she "was not able to move her right foot with as much freedom as she could her left foot." And so he decided he should not "lengthen [her] heel cord," but accomplish the same effect by cutting through one of the two leg muscles that control foot motion—the gastrocnemius muscle. The proposed severance was to be on the back of the leg about an inch or two above the ankle.

Defendant advised surgery. He said he explained what he wanted to do and that the "procedure was going to be very involved." Plaintiff stated, however, she could not remember defendant saying anything about bone or joint fusions or cutting any leg muscles. She did recall he said he was going to remove the bunion on her right foot and take a look at her ankle bone to see if there was any arthritis and if there was he would clean it out.

On August 29, plaintiff was anesthetized and placed on the operating table. When defendant got through, he had performed bunionectomies bilaterally, a "double" arthrodesis, and incised the large calf muscle—the gastrocnemius. He said the reason he did a double fusion instead of a triple was because he found the first two joints to be "somewhat" arthritic but not the third—the subtalar joint.

Upon awaking postoperatively, "I was in so much pain," plaintiff said, "terrible pain." "I was very shocked ... when I woke up ... the first thing I said ... 'Goodness. Why both feet? What happened to me?'" referring to the fact that both of her feet were bandaged. She had not expected the bunion on the left foot to be removed. Nor did she know defendant was going to cut a muscle in her leg.

Severe pain in her foot continued even after she went home. Defendant said, "it takes time." Yet, it had not let up by the time plaintiff gave her deposition, April 5, 1982, forcing plaintiff to take a frightening quantity of pain killers. Moreover, she lost considerable function of her right foot—both a pathological and pain-related disability. As she explained it, the right ankle stays swollen all the time. The back of her leg is "pulling constantly when you step down," she explained. "It's pulling up the back of the leg. The heel pulls. It feels like it's drawing.... It's painful ... [a]bout halfway up" the calf.

On the technical aspect of the case, defendant at first said, "I've not done a double [midtarsal joint fusion]. I've done triples.... Triples are usually what's done, right." Then he changed and said, "Well, I say that. I've done singles and I've done doubles, yes, I have." And with regard to the leg surgery he said, "Well, I think it's accepted. There aren't many people that know how to do it."

"Is it a standard medical practice in this community?" the lawyer asked.

"Who are you talking about? Podiatrists?" defendant parried.

"Yes. Podiatrists."

"No," said the defendant, "There is a procedure similar to it, but not the identical procedure that podiatrists do here. It's called a tendo Achilles lengthening."

Defendant said everybody used the procedure he did where he trained. But "the people here have not been as exposed to

this procedure as they have to the Achilles lengthening."

No one ever said anything to plaintiff about the question of defendant's departure from standard practice until she saw a podiatrist by the name of John Goff on January 14, 1981. He told her of a different reason why podiatrists in Oklahoma do not perform "gastroc recessions" [*sic*]—a cutting of the big calf muscle to achieve a lengthening and thus more movement of the ankle joint—and that is they are "not licensed to do that procedure" in Oklahoma.

"A podiatrist is a physician and surgeon who's licensed to diagnose and treat pathology of the foot and ankle," said Dr. Goff, and bluntly added, "it's not an accepted procedure in this community."

Nor had anyone told plaintiff, until January 14, 1981, that in the first place the midtarsal fusion was probably uncalled for because of a lack of medical indications, and, in the second place, plaintiff's complaints and the condition of her right foot suggested that doing a double instead of a triple fusion resulted in a non-fusion because of continued movement of the unfused joint. It was also the first time anyone had told her that once an unsuccessful fusion has been attempted, the joint surfaces are destroyed, the condition is irreversible and generally worsens progressively.

This action was filed May 18, 1981, and the petition was amended August 6, 1981.

It was under these recorded circumstances that the trial court granted defendants a summary judgment.

## II

While the trial court's judgment does not disclose its foundation, we will assume it was that the statute of limitations—76 O.S. 1981 § 18—barred the action. This is the only reason mentioned in defendants' motion for summary judgment and the limita-

tions issue is the only one argued by the parties. So the dispositive question is whether the pleadings and depositions warrant the trial court's conclusion. Or, more specifically, is there any material fact issue that requires resolution with regard to whether plaintiffs' action is barred by the statute of limitations provisions of 76 O.S. 1981 § 18.

Subject statute reads as follows:

An action for damages for injury or death against any physician, health care provider or hospital licensed under the laws of this state, whether based in tort, breach of contract or otherwise, arising out of patient care, shall be brought within two (2) years of the date the plaintiff knew or should have known, through the exercise of reasonable diligence, of the existence of the death, injury or condition complained of; provided any action brought more than three (3) years from the date of the injury shall be limited to actual medical and surgical expenses incurred or to be incurred as a direct result of said injury, provided, however, the minority or incompetency when the cause of action arises will extend said period of limitation.[2]

In defense of the trial judge's ruling defendant contends that plaintiff knew of the injury or condition of which she complains more than two years before she filed this lawsuit. The argument is that plaintiff knew of the "injury or condition" of which she now complains because she knew her foot did not heal within three weeks after surgery as she was told it would, but instead continued to be painful, discolored, and swollen until at least April 1979, and in fact, "none of her expectations with respect to the surgery had been met when she left Dr. Brown's care in January or February, 1979." And February 1979 was more than two years before she filed this lawsuit.

■ The trouble with this reasoning is that it implicitly construes the statute as

**2.** The constitutionality of this special statute is not raised and need not be determined in the situation presented.

meaning that the two-year limitations period runs against the "death, injury or condition complained of." It does not. And, in the nature of things it cannot. It cannot be a limitation on "death, injury or condition." Such construction makes no sense, grammatically or otherwise. A statute of limitations of necessity has to run against an intangible something that can be judicially enforced—a claim, or more specifically a right to enforce a claim. It is a limit on the time in which an *action* can be brought to obtain redress for a "death, injury or condition." In other words, it is a right to recover damages that is barred, not a death, injury or condition. *Redwine v. Baptist Medical Center of Oklahoma, Inc.*, 679 P.2d 1293 (Okla.1983). Indeed, as the court put it in *Redwine,* "There is not, nor can there be a cause of action for death, injury, or condition unless the death, injury or condition is *wrongful.* Thus the element of *wrongfulness* by necessary implication is an integral and inseparable part of the 'action' referred to." And so, concluded the court, it is the existence of a *"wrongful* 'death, injury or condition ...'" that plaintiff is charged with knowing about that triggers commencement of the section 18 limitations period.

█ While the record here may justify the conclusion that plaintiff was aware of the postoperative condition of her right foot and leg and that she even knew both were injured by defendant, there is no evidence she knew prior to January 14, 1981, that the injury or condition was wrongful and that therefore she possessed an actionable claim.

Whether through the exercise of reasonable diligence she should have known of her right of action remains a potential issue which defendants are at liberty to raise and, if they can, prove to the satisfaction of the jury she should have. Germane to such an issue is plaintiff's complaint of defendants' misrepresentations and concealment of material facts relating to their malpractice.

III

The summary judgment is vacated and the cause is remanded for further proceedings.

DeMIER, P.J., and STUBBLEFIELD, J., concur.